**STATE OF NEW YORK, Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY, Defendant.**

**No. 83–CV–1615.**

United States District Court, N.D. New York.

June 26, 1984.

Robert Abrams, Atty. Gen. of State of N.Y., New York City, U.S. Dept. of Justice, Environmental Enforcement Section, Land and Natural Resources Div., Washington, D.C., for plaintiff; Norman Spiegel, Nancy Stearns, Asst. Attys. Gen., New York City, and Nancy B. Firestone, Washington, D.C., of counsel.

Covington & Burling, Washington, D.C., Susan Phillips Read, Corporate Counsel, Environmental Programs, General Elec. Co., Schenectady, N.Y., for defendant; Allan J. Topol, Patricia A. Barald, Corinne A. Goldstein, Washington, D.C., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This action seeking injunctive, declaratory and monetary relief arises out of the allegedly unlawful disposal of certain hazardous wastes by defendant General Electric Company ("GE"). The action is brought by New York State pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9657 ("CERCLA")[1], the New York State Real Property Actions and Proceedings Law, N.Y. Real Prop. Acts. Law § 841 (McKinney 1979), and the New York common law of public nuisance. Jurisdiction is predicated upon 28 U.S.C. § 1331, 42 U.S.C. § 9613(b) and the doctrine of pendent jurisdiction. Before the Court is GE's motion to dismiss the complaint[2] for failure to state a claim upon which relief can be granted, Fed.R. Civ.P. 12(b)(6).

### II

Defendant GE operates several manufacturing plants in the State of New York, including plants at Hudson Falls and Fort Edward, New York. According to plaintiff's complaint,[3] in the early 1960's GE disposed of between four and five hundred fifty-five gallon drums of used transformer oil from those two plants through sales to the South Glens Falls Dragway, Inc., Allie Swears, and Carl Becker. The oil, which contained hazardous substances including polychlorinated biphenyls ("PCBs") and dibenzofurans, was used at the South Glens Falls Dragstrip ("dragstrip") for purposes of dust control.[4] In 1982 and 1983, chemical analyses of soil samples taken by plaintiff from the dragstrip and its environs revealed PCB[5] contamination as high as 2900 parts a million and dibenzofuran contamination as high as 12 parts a billion. Analysis of air samples taken in June of 1983 indicated PCB contamination in the ambient air as well. This contamination apparently results in release of PCBs into the ambient air by volatilization as well as migration of the contaminants through the

---

**1.** The Act is more commonly known as the "Superfund" Act.

**2.** Although the present motion is addressed to the original complaint, plaintiff filed and served an amended complaint four days prior to oral argument. Nonetheless, since the changes embodied in the amended complaint are not substantive ones, with the exception of a new claim for declaratory relief, the Court will consider the motion to dismiss in light of the amended complaint.

**3.** Since the present motion is made pursuant to Fed.R.Civ.P. 12(b)(6), the factual allegations contained in the complaint must be taken as true. *Kugler v. Helfant,* 421 U.S. 117, 125 & n. 5, 95 S.Ct. 1524, 1531 & n. 5, 44 L.Ed.2d 15 (1975); *Fine v. City of New York,* 529 F.2d 70, 75 (2d Cir.1975). A complaint should not be dis-

missed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *accord Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

**4.** Apparently, South Glens Falls Dragway, Inc., was dissolved some time around 1970 and the dragstrip has not been used for organized racing for a number of years. The dragstrip is regularly used, however, by the public for picnics, walks, and dirt-bike riding.

**5.** PCBs are deemed a toxic substance under the Toxic Substance Control Act, 15 U.S.C. § 2605(e) and are defined as a hazardous substance under CERCLA, 42 U.S.C. § 9601(14).

soil and towards the groundwater. According to the amended complaint, "[t]hese releases of hazardous substances have caused damage to the soil and ambient air and to other natural resources of the State of New York ... [and] [t]he hazardous chemical contamination ... causes harm and threatens additional harm to the health and safety of the people of the State of New York particularly those living in the Town of Moreau or using the area in and around the South Glens Falls Dragstrip." Amended complaint, ¶¶ 18–19.

On November 30, 1983, pursuant to section 112(a) of CERCLA, 42 U.S.C. § 9612(a), the state presented its claim to defendant for damages to the natural resources and "for the costs of removal, remediation and response with respect to the identification, definition, monitoring, control and abatement of the contamination at and around the South Glens Falls Dragstrip." Amended complaint, ¶ 20. GE has failed to satisfy the claim for these items and accordingly the state "has incurred and continues to incur expenses and costs to respond to ... the contamination at and around the South Glens Falls Dragstrip and has suffered and continues to suffer damages to the natural resources of the State of New York in amounts not yet ascertained ...." *Id.* ¶ 21.

This relatively simple factual background lays the predicate for three causes of action set forth in plaintiff's amended complaint. The first cause of action alleges that GE is strictly liable under section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), "for all damages sustained and to be sustained by the land, wildlife, biota, groundwater, ambient air and other such natural resources of the State and for all costs and expenses incurred or to be incurred by the State of New York for the removal, remediation and response to all contamination at and in the environs of the South Glens Falls Dragstrip ...." Amended complaint, ¶ 23. The second and third causes of action concern alleged violations of state statutory and common law.[6] GE has not moved against these claims on the merits but rather has only taken the position that the dismissal of New York's federal CERCLA claims would require dismissal of the state claims under the jurisprudential considerations of pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Plaintiff seeks reimbursement from GE for

all damages sustained to the natural resources of the State including the cost of assessing such injury, destruction or loss and for all the costs and expenses incurred by the State of New York for the removal, remediation and response to all contamination at and around the South Glens Falls Dragstrip as allowed by Section 107(a)(A) and (C) of the Superfund Act, 42 U.S.C. § 9607(a)(A) and (C).

Amended complaint at 11. Moreover, plaintiff seeks a declaratory judgment, 28 U.S.C. § 2201, declaring that GE is liable for all such damages incurred and to be incurred. Finally, plaintiff requests that defendant be ordered to monitor the contamination at the dragstrip and abate completely and permanently the nuisance caused by the migration of the hazardous substances. Defendant now moves to dismiss the complaint on a number of grounds.[7]

---

**6.** In particular, plaintiff's second cause of action alleges that GE knew or should have known that its disposal of contaminated transformer oil was an abnormally dangerous activity for which it would be strictly liable under common law and the New York State Real Property Actions and Proceeding Law, N.Y. Real Prop. Acts. Law § 841 (McKinney 1979). The third cause of action alleges that GE had a duty to exercise reasonable care in its disposal of hazardous wastes and that its failure to do so constitutes negligence and a continuing public nuisance under both common law and the New York Real Property Actions and Proceeding Law, N.Y. Real Prop. Acts. Law § 841 (McKinney 1979).

**7.** The United States, as amicus curiae, has joined with plaintiff in opposing the present motion, and with the Court's permission, has submitted a memorandum of law through the Environmental Enforcement Section of the U.S. Department of Justice. The interest of the Unit-

## III

### A. *Applicability of section 107*

G⊡ argues that there is no basis for liability under Section 107 of CERCLA, 42 U.S.C. § 9607, the relevant subsection of which provides for liability of persons

> who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances ....

42 U.S.C. § 9607(a)(3).[8] GE's argument is twofold: First, it argues that because a dragstrip is not a hazardous waste facility there can be found no liability under section 107(a)(3). Second, it contends that liability may not be premised upon section 107(a)(3) because it did not "contract or otherwise arrange for 'disposal or treatment'" of the transformer oil within the meaning of the statute. This Court rejects both of defendant's contentions.

Section 107(a)(3) provides for liability of "any person who ... arranged for disposal ... of hazardous substances owned or possessed by such person ... at *any facility* owned or operated by another ...." 42 U.S.C. § 9607(a)(3) (emphasis added). Section 101(9) of CERCLA defines "facility" in exceptionally broad terms, to include:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a

hazardous substance has been deposited, stored, disposed of or placed, or otherwise come to be located ....

42 U.S.C. § 9601(9). *See* 1 Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, at 783 (1980) ("[T]he definition of 'facility' is necessarily a broad one. It explicitly defines facility as, among other things, any site or area, where a hazardous substance has been deposited, stored, disposed of, or otherwise come to be located").

 Arguing that "[t]he legislative history leaves no question as to the reach of Section 107(a)(3)," GE suggests that mere sales of chemicals to an entity other than a hazardous dump site simply are not within the statute's contemplation. Because the dragstrip here at issue was not "a facility owned and operated by another party ... *containing such hazardous substances,*" GE views its actions as not within the statutory proscription. The thrust of its argument is that a covered facility may only be one already containing hazardous substances. This construction, GE argues, is consistent with the legislative history of CERCLA which evinced a congressional concern regarding the problems attendant upon "dump sites," for example, sites such as the "Valley of the Drums" in Kentucky. *See, e.g.,* 126 Cong.Rec. H9154–55 (daily ed. Sept. 19, 1980); 126 Cong.Rec. S14974, S14977 (daily ed. Nov. 24, 1980); H.R.Rep. No. 1016, Part 1, 96th Cong., 2d Sess. 18– 20 (1980), U.S.Code Cong. & Admin.News 1980, p. 6119; S.Rep. No. 848, 96th Cong., 2d Sess. 2–5, 7–10 (1980). Since the complaint has not alleged that the dragstrip was ever used for other than its principal purpose, i.e., automobile racing, or that hazardous wastes had previously been dis-

---

ed States is described in that memorandum as twofold: First, the United States relies to a great extent on the response of states to the widespread problems generated by the disposal of hazardous wastes. Second, the United States is vitally interested in the outcome of actions brought under CERCLA to the extent that its own CERCLA actions may be affected by any adverse rulings.

**8.** There was apparently some confusion on the part of plaintiff as to which subsection under § 9607 they were relying upon. While paragraph 23 of the complaint asserted liability pursuant to § 9607(a)(2), the amended complaint clarified the fact that liability is actually asserted pursuant to § 9607(a)(3). Since both parties appear to have focused their attention on the latter subsection, the Court need not address the applicability of the former, apparently cited inadvertently.

posed of there, GE urges the Court to find no liability. Although not lacking entirely in intuitive appeal, the Court finds GE's hypertechnical construction to be unsupported by the legislative history and contradicted by simple common sense.[9]

First, the broad language employed in section 101(9) dispels any notion that CERCLA was designed to cover only traditional dump sites. That section expressly covers buildings, pipelines, motor vehicles, rolling stock, aircraft and *any area* where hazardous substances come to be located. 42 U.S.C. § 9601(9)(B). Moreover, the legislative history makes clear Congress' intent to address the problem of hazardous wastes rather than merely a particular category of disposal sites. Indeed, it appears that Congress sought to deal with every conceivable area where hazardous substances come to be located, including not only the Valley of the Drums, but, for example, dirt roads in Texas contaminated with nitrobenzene and cyanide as a result of oiling, 126 Cong.Rec. H9447 (daily ed. Sept. 23, 1980) (remarks of Rep. Eckhardt), radium waste sites scattered throughout Colorado found to be "under restaurants, in empty lots where children play, [and] near factories ...," 126 Cong.Rec. S14975 (daily ed. Nov. 24, 1980) (remarks of Sen. Hart), tanks filled with toxic chemicals abandoned near the Nanticoke River in Maryland, 126 Cong.Rec. H9162 (daily ed.

Sept. 19, 1980) (remarks of Rep. Bauman), PCBs dumped into the Hudson River, 126 Cong.Rec. S14963 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph), and spills of hazardous substances on the George Washington Bridge, 126 Cong.Rec. S14972 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph).[10]

Finally, plaintiff suggests that the relevant case law has established the invalidity of GE's position. *United States v. South Carolina Recycling & Disposal, Inc.*, No. 80–1274–6 (D.S.C. Feb. 21, 1984), and *United States v. Wade*, 577 F.Supp. 1326, 20 ERC 1277 (E.D.Pa.1983), according to plaintiff, have both recently held that the phrase "and containing such hazardous waste" means only that the site at which a party is charged with having dumped hazardous substances must in fact contain such substances. While the Court accepts and concurs in the conclusion thus stated by plaintiff, it questions whether the cited cases actually state such a proposition. Both the *Wade* and *South Carolina Recycling* courts were addressing themselves not to the question of whether a site must be a preexisting disposal site, but rather whether causation must be proved against a particular waste generator. Reasoning that a requirement that a plaintiff "fingerprint" wastes would eviscerate the purposes of CERCLA, the *Wade* court held simply that a plaintiff need only prove a

9. Acceptance of GE's construction would require a conclusion that "first time" dump sites could never be considered covered facilities since prior to any initial placement of wastes such a facility would not be one "containing such hazardous substances." Necessarily, the first party to dispose of wastes at a theretofore unexploited site would never be subject to CERCLA, as only second-comers would be viewed as within the statute's proscriptions. Not only would the early bird catch the worm but it would escape liability as well. Were such a construction to obtain, circumvention of CERCLA would be pervasive and proliferation of waste sites would certainly intensify. Waste dumpers would be ever intent upon seeking new places to dispose of their wastes liability-free, rather than confine their disposal to already existing facilities.

To accord CERCLA's liability provisions any meaning at all, the language "containing such

hazardous substances" found in section 107(a)(3) must be construed as referring to facilities that have been, by a depositor's actions, contaminated by waste. Because the South Glens Falls Dragstrip does indeed now contain certain hazardous substances, allegedly originating with GE, it quite properly is a facility within the ambit of CERCLA.

10. As the Government points out, "the specific problem of improper disposal of hazardous substances onto roads and streets did not escape Congress' attention. For example, the House Report notes a case where 'waste oil contaminated with toxic chemicals was laid on 9 roads in East Texas.'" Memorandum of the United States of America as *Amicus Curiae* at 15 (quoting H.R.Rep. No. 96–1016, 96th Cong., 2d Sess. 19–20, U.S.Code Cong. & Admin.News 1980, p. 6122).

defendant's waste was disposed of at the site and that the hazardous substances thereafter be present at the site. 577 F.Supp. 1326, 20 ERC at 1281. In any event, the Court is satisfied that the drag-strip is a covered facility under section 107(a)(3), and that the complaint is not subject to dismissal on these grounds.

GE also argues it is not a responsible party under section 107(a)(3) since it did not "arrange[ ] for disposal or treatment" of hazardous substances within the meaning of the statute. "Disposal" is defined under section 101(29) of CERCLA, 42 U.S.C. § 9601(29), by reference to section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903, which defines disposal as

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). Specifically, GE contends that the complaint alleges only that it sold or otherwise supplied used transformer oil to the South Glens Falls Dragway, Inc., and not that it entered into an agreement or arrangement to have the oil deposited or otherwise placed on the dragstrip. At most, GE suggests, the complaint alleges only that it "entered into an agreement to supply oil to the drag strip in the ordinary course of commerce to be used as the drag strip owners saw fit," Memorandum of Points and Authorities in Support of General Electric Company's Motion to Dismiss at 13, and concludes that "Congress never intended to make a supplier liable for the subsequent action of a purchaser in the ordinary course of a business other than waste disposal." *Id.* Because the conduct giving rise to any response costs here was the application of the oil to the dragstrip by its owners, GE urges that it cannot therefore be held liable.

■ GE's contention must be rejected for a number of reasons. First, because this is a motion to dismiss, the allegations in plaintiff's complaint must be construed most favorably in plaintiff's behalf. *See supra* note 3. Section 107(a)(3) imposes liability for response costs upon "any person who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances ...." 42 U.S.C. § 9607(a)(3). Here, plaintiffs have alleged that GE disposed of hazardous substances by arranging with the South Glens Falls Dragway to remove the substances from GE's plants with knowledge or imputed knowledge that the substances would be deposited on the land surrounding the dragstrip. The Court is not prepared to hold that the complaint does not allege an arrangement for the disposal of wastes.

Moreover, the legislative history of CERCLA makes clear that "persons cannot escape liability by 'contracting away' their responsibility or by alleging that the incident was caused by the act or omission of a third party." S.Rep. No. 96–848, 96th Cong., 2d Sess. 31 (1980). At least as a pleading matter, it appears clear that GE arranged or contracted with other parties to dispose of its waste; accordingly, it is not entitled to avoid liability. Finally, it is equally clear that a waste generator's liability under CERCLA is not to be so facilely circumvented by its characterization of its arrangements as "sales." *See United States v. A & F Materials, Co.,* 582 F.Supp. 842, 20 ERC 1353 (S.D.Ill.1984).

B. *Failure to incur response costs*

Defendant next argues that plaintiff's complaint must be dismissed because plaintiff has not yet expended funds for the clean-up of the hazardous waste site. *See* 42 U.S.C. § 9607(a)(4)(A) (providing for recovery of "costs of removal or remedial action *incurred*" (emphasis added)). Citing *Environmental Defense Fund v. Lamphier,* 12 Env.L.Rep. 20843 (E.D.Va.1982), and *Ohio ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300 (N.D.Ohio 1983), GE contends that an action under section 107 may not be maintained unless the plaintiff demonstrates that it has actually begun clean-up operations and expended funds for such

clean-up. Moreover, GE suggests that costs of investigation are not response costs under 42 U.S.C. §§ 9601(23)–(25). Finally, GE claims that costs "to be incurred" are not recoverable as costs under a plain reading of section 107.

■ With respect to this aspect of the motion to dismiss, several points are in order. First, plaintiff's complaint specifically sets forth a claim for damages to the state's natural resources in addition to its claim for response costs, 42 U.S.C. § 9607(a)(4)(C)[11], and there is no requirement that money must be expended by the state before it can seek to recover for damages to natural resources. Second, it is clear that plaintiff has properly alleged recoverable response costs under section 107(a)(4)(A) and (C). Specifically, ¶ 21 of the amended complaint alleges that the state "has incurred and will continue to incur expenses and costs . . . ." As a pleading matter, that allegation must be construed in the light most favorable to plaintiff and, contrary to GE's suggestion, plaintiff need not particularize the costs thus far incurred.

Finally, those initial response costs undertaken thus far by plaintiff are clearly authorized as costs of response under section 101(23), 42 U.S.C. § 9601(23). Removal action is defined under that section to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances . . . ."[12] *See United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823, 20 ERC 1401, 1425 (W.D.Mo.1984); *United States v. Wade*, 577 F.Supp. 1326, 20 ERC 1277, 1281 n. 4 (E.D.Pa.1983). Defendant's reliance on *Environmental Defense Fund, Inc. v. Lamphier*, 12 Env.L.Rep. 20843 (E.D.La.1982) and *Ohio ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300 (N.D.Ohio 1983) for the proposition that costs of in-

vestigation are not recoverable is misplaced. *Lamphier* held only that costs associated with the investigation of defendant as opposed to the statutorily permitted costs associated with the monitoring, assessing and evaluating of environmental problems were not recoverable. The *Brown* court specifically noted this distinction. *See* 562 F.Supp. at 1316.

In a supplemental memorandum submitted prior to oral argument, GE has brought to the Court's attention the decision of the District Court for the Central District of California in *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, No. CV 83–7996–LTL (C.D.Cal. Mar. 5, 1984), assertedly supportive of the proposition that investigative costs are not recoverable. Citing with approval the decision in *D'Imperio v. United States*, 575 F.Supp. 248 (D.N.J.1983), the *Cadillac Fairview* court held that clean-up costs incurred in fencing off a site and conducting chemical analyses, were not recoverable. Slip op. at 31–32. That decision is distinguishable, however, in at least two respects. First, the action before the court entailed interpretation of section 107(a)(4)(B) rather than section 107(a)(4)(A) and (C). That section is applicable to parties other than federal or state governments and establishes significantly different cost recovery criteria. *See United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823, 20 ERC 1401, 1425 (D.Mo.1984) ("On its face, section 107(a)(4)(B) intends that a different standard apply to cost recovery by nongovernmental entities . . . ."). Second, it is clear that the *Cadillac Fairview* court did not look at all to the strictures of section 101(23) and (25) which expressly provide that costs associated with monitoring, assessing, and evaluating the release or threat of release of hazardous sub-

---

**11.** 42 U.S.C. § 9607(a)(4)(C) provides for liability encompassing "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

**12.** There is no dispute that plaintiff has in fact undertaken field and laboratory work in order to monitor, assess, and evaluate the release and threat of release of hazardous substances and has incurred expenses as a consequence of these efforts.

stances are recoverable under section 107(a)(4)(A).[13]

Finally, GE contends that future response costs are not recoverable under CERCLA. The Court declines to reach this particular issue at this juncture since, even if future costs are not recoverable, the foregoing discussion establishes that plaintiff has otherwise stated a claim for costs incurred.[14]

### C. *Failure to comply with notice provisions*

Based on section 112(a) of CERCLA, 42 U.S.C. § 9612(a), GE claims that plaintiff's complaint must be dismissed for failure to comply with that section's sixty-day notice requirement. According to GE, section 112(a) provides that a claim "shall be presented in the first instance to the owner, operator, or guarantor ... of ... [a] facility from which a hazardous substance has been released ..., and to any other person known to the claimant who may be liable ..." under section 107. 42 U.S.C. § 9612(a). Only if such a claim is not satisfied within sixty days of its presentation may suit be brought.[15] While GE received a letter from plaintiff on November 30, 1983 advising it of the substance of the assertion of liability, it claims that such notice was defective in two respects. First, the letter did not request a sum certain, *see supra* note 15, and second, suit was filed just eight days later. Accordingly, GE ar-

gues that the present action must be dismissed.

GE acknowledges that this is a case of first impression, noting that no other court has yet confronted the question of whether failure to comply with the sixty-day notice requirement amounts to a jurisdictional defect.[16] It argues, however, that courts interpreting notice provisions in similar environmental protection statutes have found such requirements to be in fact jurisdictional. *See, e.g., City of Evansville v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008 (7th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980) (Clean Water Act, 33 U.S.C. § 1365); *Massachusetts v. United States Veterans Administration*, 541 F.2d 119 (1st Cir.1976) (same); *Friends of the Earth v. Carey*, 401 F.Supp. 1386 (S.D.N.Y.1975), *aff'd in part on other grounds and rev'd in part*, 535 F.2d 165 (2d Cir.1976), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977) (Clean Air Act, 42 U.S.C. § 1875h–2(b)). Although some courts have adopted a "pragmatic" approach to such notice requirements and refused to dismiss prematurely filed complaints since they could simply be re-filed after the expiration of the notice period, *see Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231, 243 (3d Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981), GE argues that such a

---

**13.** Indeed, in *D'Imperio v. United States*, 575 F.Supp. 248 (D.N.J.1983), upon which the *Cadillac Fairview* court relied, the court acknowledged that it might be "reading this section [107(a)(B) ] too narrowly," when it nonetheless held that the costs of a feasibility study were not recoverable. 575 F.Supp. at 253.

**14.** The parties have presented the Court with three cases on the issue of future costs. *United States v. Price*, 13 Env.L.Rep. 20843 (D.N.J. 1983), urged by GE, apparently holds that future costs are not recoverable. *United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823, 20 ERC 1401 (W.D.Mo.1984), and *United States v. Wade*, 577 F.Supp. 1326, 20 ERC 1277 (E.D.Pa.1983), noted by plaintiff, on the other hand, held that costs "to be incurred" are recoverable. None of the decisions is generous in analysis, although the *Wade* court reasons that permitting future recovery "better ef-

fectuates the purposes of the Act ...." 577 F.Supp. 1326, 20 ERC at 1283. Since there is no need to pass on this question now, the Court defers judgment on this aspect of the complaint pending further briefing by the parties.

**15.** A claim is defined in section 101(4), 42 U.S.C. § 9601(4) as "a demand in writing for a sum certain."

**16.** In *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa.1982), the court was able to avoid deciding the issue because it concluded that although the satisfaction of the notice provision had not been pleaded, notice had actually been given. The court did note, however, that it was "inclined to reject defendants' mechanistic interpretation of the claims procedure under Section 112(a) ...." *Id.* at 1144 (footnote omitted).

line of reasoning is inapplicable to the present suit. The basis for this assertion stems from the statute of limitations contained in section 112(d) of CERCLA, 42 U.S.C. § 9612(d), which provides that no action may be commenced later than three years after the date of discovery of the loss or three years from enactment of CERCLA, whichever is later. Three years from the enactment of CERCLA was December 11, 1983, and that is alleged to be the last date on which a claim could have been filed. GE concludes, therefore, that plaintiff is not entitled to re-file its complaint at the expiration of the sixty-day period. The Court is not persuaded, however, that the December 11th date is controlling. GE argues that because the activities in question took place in the early 1960's, and because there is no allegation in the complaint that the alleged loss was not discovered until some later time, "it must be presumed that December 11, 1983 was the last date on which a claim for damages under CERCLA could be filed." Memorandum of Points and Authorities in Support of General Electric Company's Motion to Dismiss at 23. Construing the complaint's allegations most favorably to plaintiff, including the allegations that sampling was conducted in 1982 and 1983, amended complaint, ¶ 11, it would be unreasonable to presume that discovery was had before those dates. Accordingly, as a pleading matter, it appears that the statute of limitations would not expire until some time in 1985, and GE's attempt to distinguish the "pragmatic" approach to filing requirements therefore loses much of its vitality.[17] In any event, the Court is satisfied that the sixty-day notice requirement is not dispositive for a number of other reasons.

First, and perhaps most importantly, defendant's reliance on the sixty-day notice requirement is misplaced. The first sentence of section 112(a) expressly provides that "[a]ll claims which may be asserted against the Fund [the Superfund] pursuant to section 9611 of this title shall be presented in the first instance to the owner ...." 42 U.S.C. § 9612(a). It is clear, therefore, that the notice provision applies only to actions in which a claim is sought to be made against the Fund; it does not apply when a CERCLA case is merely brought against a responsible party such as GE. Notification in Fund cases is a necessary prerequisite aimed at conserving the assets of the Superfund by encouraging responsible parties to pay clean-up costs before a plaintiff is forced to look to Fund money. Because New York's suit here involves claims for certain costs which may not be asserted against the Fund, but only against GE, the provisions of section 112(a) are not applicable.

Second, the Court is persuaded that in any event, the sixty-day requirement is not jurisdictional. The cases cited by GE, which arose in the context of suits involving other environmental statutes, embodied interpretations of significantly different statutory mechanisms. Unlike the Clean Water Act and the Clean Air Act, which impose notice requirements that are compatible with those statutes' preference for initial administrative rather than private action, *see Massachusetts v. United States Veterans Administration*, 541 F.2d 119, 121 (1st Cir.1976), the purpose of CERCLA seems only to require notice in order to facilitate negotiated settlements. The fact that sixty days elapsed prior to the instant motions comports with the pragmatic approach to the notice requirement, since the

---

**17.** Plaintiff offers two additional grounds which speak persuasively to the fact that the statute of limitations has not yet run. First, the statute of limitations provision contained in section 112(d) appears to apply only to actions for damages to natural resources and not to claims for removal and remedial action which are also alleged here. *See* 42 U.S.C. § 9612(d). Damages are defined under CERCLA as "damages for injury or loss of natural resources as set forth in section 9607(a) or 9611(b) of this title." 42 U.S.C. § 9601(6). Second, plaintiff suggests that even as to resource damages, the present action would still be timely based on a theory of continuing nuisance. That is, even if the injury was discovered more than three years ago, because the injurious activity has not yet abated, the wrong is a continuous one and the cause of action must therefore continue to accrue.

parties were afforded adequate time in which to avoid any court intervention.

Finally, it is apparent that the rule in this circuit embodies the principle that such notice requirements are not jurisdictional. *See Council of Commuter Organizations v. Metropolitan Transportation Authority*, 683 F.2d 663, 669 (2d Cir.1982); *Friends of the Earth v. Carey*, 535 F.2d 165, 175–76 (2d Cir.1976), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 508 F.2d 927, 938 (2d Cir.1974), *vacated and remanded on other grounds*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *rev'd on other grounds*, 531 F.2d 637 (2d Cir.1976).

### D. *Injunctive relief*

Paragraph two of plaintiff's prayer for relief requests that the Court grant injunctive relief in the nature of ordering monitoring and abatement of the contamination here complained of. GE argues that such relief is not available under CERCLA which permits only the recovery of monetary damages, and therefore, that that claim should be dismissed. This Court does not agree. First, even assuming that injunctive relief is impermissible under CERCLA, GE has ignored the fact that plaintiff has pleaded additional state law claims in the nature of nuisance for which injunctive relief clearly is appropriate. At this stage of the litigation, therefore, it would be premature to conclude that injunctive relief is entirely unavailable. Second, the Court is not convinced that, notwithstanding the absence of any express grant of an equitable remedy in CERCLA, the Court is without power to entertain a claim for and order such relief under its inherent equitable powers. Since a finding in plaintiff's favor on the state law claims would render this question academic, however, the Court chooses to defer passing on the question of the availability of such relief until such time as necessary and with the benefit of more thorough briefing by the parties.

### E. *Claims cognizable under CERCLA*

GE's most broadly based argument in support of its motion to dismiss is found in its contention that the present suit does not embody claims cognizable under CERCLA. Downplaying the environmental threat posed by the dragstrip site relative to more substantial threats found at other, larger dump sites, GE insists that the present suit is simply not within the contemplation of the statute. This view is premised on the statute's distinction between "removal"[18] and "remedial"[19] action and GE's claim that the drafters of the statute intended that either type of action could be undertaken only in accordance with a national contingency plan ("NCP") to be developed by the Environmental Protection Agency ("EPA"). Pointing to the legislative history, GE suggests that the act was keyed to the NCP in order to insure that

> cost-benefit considerations [be taken] into account, not only in determining whether particular measures are cost effective given a decision to take action under the act, but also in determining whether and when action should be taken at all.

126 Cong.Rec. S15007 (daily ed. Nov. 24, 1980) (remarks of Sen. Helms). Accordingly, GE argues that under the NCP, immediate removal is justified only by "emergency situations which require rapid, immediate response," 47 Fed.Reg. 31,193 (1982), "a condition not even alleged to be the case here." Memorandum of Points and Authorities in Support of General Electric Company's Motion to Dismiss at 4. Absent

---

**18.** Removal action refers to emergency or crisis measures including "spill containment measures; measures required to warn the public of, and protect it from acute damages; temporary evacuation and housing; [and] activities necessary to close an existing public water supply system." S.Rep. No. 848, 96th Cong., 2d Sess. 53–54 (1980). *See* 42 U.S.C. § 9601(23).

**19.** Remedial action deals with "those actions consistent with permanent remedy ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24).

an emergency, the only response authorized by the NCP, GE suggests, is remedial action or planned removal. This, in turn, GE contends, can only be undertaken at sites listed by the EPA pursuant to 42 U.S.C. § 9605(8)(B) on the national priorities list, that is, those sites which appear to present the most significant threat of harm to human health. *See* 40 C.F.R. § 300.68(a) (1983).[20] Against this backdrop, GE asserts that New York "has virtually turned CERCLA on its head, far overreaching the statutory scheme created by Congress ... [,] aim[ing] its enforcement arsenal not at a chemical dump site (as contemplated by Congress), but at a mere dragstrip." Memorandum of Points and Authorities in Support of General Electric Company's Motion to Dismiss at 6. Because the dragstrip assertedly does not present the type of situation contemplated by CERCLA and has not been listed on the national priorities list, GE insists that the complaint must be dismissed.

■■■ The Court rejects GE's restrictive reading of CERCLA's liability provisions as it is based on a fundamental misapprehension of the statute itself. It is clear that CERCLA's approach to the serious problems generated by the disposal of hazardous wastes embodied a bifurcated remedial scheme. *See United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.Minn.1982). This dual approach entailed imposition of liability on waste generators on the one hand, *see* 42 U.S.C. § 9607, and the creation of the Superfund, on the other. *See* 42 U.S.C. §§ 9604, 9605, 9611 & 9612.

The liability provisions were an essential element of the statute because the Fund itself could not adequately remedy the pervasive waste problem.[21] It is clear beyond doubt that the liability provisions are independent of the national priorities list of sites eligible for Superfund money, since the "requirement for a National Priorities List was not intended to be a limitation on liability but rather was the result of the great concern voiced in Congress that the limited trust fund monies not be used for ill-conceived or disorganized cleanup efforts." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Complaint at 20. *See, e.g.*, 126 Cong. Rec. S14982 (daily ed. Nov. 24, 1980) (comments of Sen. Dole); *id.* at S14978 (comments of Sen. Humphrey); *id.* at S15007 (comments of Sen. Helms).[22]

The courts that have considered the question consistently have held that the liability provisions of CERCLA are independent of any Superfund requirements. *See United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823, 20 ERC 1401, 1425 (W.D.Mo.1984); *United States v. Wade*, 577 F.Supp. 1326, 20 ERC 1277, 1284 (E.D.Pa.1983); *Ohio ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300, 1315 (N.D.Ohio 1983); *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1118 (D.Minn.1982). The Superfund restrictions advanced by GE as a bar to the present action are simply inapplicable.

Section 104 sets restrictions on the use of Superfund money to prevent improvident

20. According to GE, once a site has been placed on the national priorities list, the federal government may arrange for cleanup activities at the site with financing from the $1.6 billion Superfund. Those cleanup activities must be undertaken in accordance with a national contingency plan. *See* 42 U.S.C. §§ 9604, 9611.

21. At the time of CERCLA's passage, the EPA estimated that as many as 30,000 to 50,000 inactive and uncontrolled hazardous waste sites existed in the United States, and estimated that cleanup of the 1200 to 2000 most dangerous sites alone would cost between $13.1 and $22 billion. H.R.Rep. No. 1016, 96th Cong., 2d Sess. 18, 20 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 6120, 6123.

22. The Court finds disingenuous GE's omissive reference at various points in its brief to portions of the legislative history assertedly supportive of its position that the present action is not within the contemplation of CERCLA. For example, GE's reference to the statement by Sen. Stafford that "CERCLA was not intended to 'clean-up or remedy any and every discharge ....'" omits the critical preceding language that "[t]he fund should not be used to clean-up or remedy any and every discharge ...." 126 Cong.Rec. S15007 (daily ed. Nov. 24, 1980) (remarks of Sen. Stafford).

or disproportionate use of a limited fund to clean up only a few of the many sites for which no solvent, responsible parties can be found.

Section 107, on the other hand, is intended to impose liability on the responsible parties who created and/or dumped the hazardous wastes. The restrictions contained in § 104 are intended to protect the integrity of the Superfund and not limit the government's replenishing it by recovery from responsible parties. Thus, the fact that government expenditures ... are not authorized by § 104 affects only the availability of Superfund money and not the generator defendants' liability.

*United States v. Wade,* 577 F.Supp. 1326, 20 ERC 1277, 1284 (E.D.Pa.1983).

### F. *Expenditure of funds consistent with CERCLA*

■ As a final ground warranting dismissal of plaintiff's complaint, GE argues that under section 107(a)(4)(A) of CERCLA, 42 U.S.C. § 9607(a)(4)(A), states may recover only costs of removal or remedial action which are "not inconsistent with the national contingency plan." In particular, GE alleges that contrary to section 104, the costs incurred by New York have not been incurred pursuant to a cooperative agreement with the federal government, section 104(d), and are therefore not recoverable under section 107. Moreover, GE claims that remedial costs may not be recovered because the dragstrip is not among the EPA's national priorities list of hazardous sites. Again, GE's contentions are unpersuasive.

The fundamental flaw in its position stems from GE's belief that section 107 "must be read in tandem with section 104, which sets standards for what costs are recoverable and the conditions under which such costs may be recovered." Memorandum of Points and Authorities in Support of General Electric Company's Motion to Dismiss at 17. Plaintiffs have demonstrated, however, that every court that has addressed this issue has held that the liability provisions of section 107(a) are separate and independent from the requirements of section 104. *See United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823, 20 ERC 1401, 1425 (W.D. Mo.1984); *United States v. Wade,* 577 F.Supp. 1326, 20 ERC 1277, 1283 (E.D.Pa. 1983); *Ohio ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1315 (N.D.Ohio 1983); *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100, 1118 (D.Minn. 1982). Not only are cooperative agreements irrelevant for purposes of liability, but so too is the national priorities list. Indeed, by authorizing state claims for cost recovery and natural resources damages, section 107 provides the state an essential tool to respond to sites which will never be addressed with Superfund money.

*Cadillac Fairview/California, Inc. v. Dow Chemical Co.,* No. CV–83–7996–LTL (C.D.Cal. Mar. 5, 1984), advanced by GE in its supplemental brief, is not to the contrary. First, that decision involved an interpretation of section 107(a)(4)(B)[23], which is applicable to plaintiffs other than federal or state governments and which establishes cost recovery criteria vastly different from those relevant to governmental entities.[24] In *United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823, 20 ERC 1401 (D.Mo.1984), the court expressly held that "[o]n its face, section 107(a)(4)(B) intends that a different standard apply to cost recovery by nongovernmental entities and that such entities must

---

**23.** Section 107(a)(4)(B) provides for recovery of "any other necessary costs of response incurred by any other person consistent with the national contingency plan...."

**24.** Section 107(a)(4)(A) provides for recovery of "all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan." Section 107(a)(4)(C) provides for recovery of "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such release."

affirmatively show that their actions were consistent." 579 F.Supp. 823, 20 ERC at 1425. Indeed, the *Cadillac Fairview* court expressly limited its holding to private suits by persons other than federal and state governments. At 23. GE misapprehends the requirements of section 107(a)(4)(A) by suggesting that plaintiff must prove it has incurred costs consistent with the national contingency plan. While that statement reflects an accurate interpretation of section 107(a)(4)(B), it is simply incorrect with respect to section 107(a)(4)(A). Plaintiff here need only incur costs not inconsistent with the NCP, *compare supra* note 23 *with supra* note 24, and the burden is on GE to demonstrate that it has not. *See United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823, 20 ERC at 1425. That burden has not been satisfied.

Finally, GE has ignored plaintiff's reliance on section 107(a)(4)(C) which allows recovery for damages to natural resources. Nowhere in that section is recovery tied in any way to the NCP or the national priorities list.

### IV

On balance, there can be no question that New York has stated a claim for cost recovery and natural resources damages cognizable under CERCLA. Accordingly, GE's motion to dismiss the complaint must be denied.

It is so Ordered.